The next case on for argument is Gross v. Graham.  Richard Langone Good morning, Your Honors. Richard Langone for Gordon Gross. Your Honors, I'd like to begin with two procedural matters. You're well aware that this is an appeal from a denial of the petition for a writ of habeas corpus by a State prisoner. The district court below, in part of our effort to address the concerns with respect to maybe failure to exhaust state remedies or procedural defaults, there was a claim made below of actual innocence. The claim was made initially as a gateway claim, and then this Court certified on the certification of the certificate of appealability for to proceed with the possible freestanding claim of actual innocence, which I'll get to. But with respect to the gateway claim, I'd like to submit to this Court that the district court employed a proper, the improper standard. They used a clear, the Court used a clear convincing evidence standard, which is actually was announced in Herrera v. Collins, and the Supreme Court pointed to that standard as the standard that would be applicable in a freestanding claim of actual innocence. And I think that with respect to AEDPA and AEDPA's focus on the idea of clearly established Supreme Court precedent, whether it's contrary to or unreasonable application of, I submit to the Court that the Court's holding in Herrera, where it speaks to the fact that it would be antithetical to the United States Constitution to allow a guilty man, a guilty woman to be, suffer a conviction. Please, you got to just keep in mind the microphone. Yes. Thank you. I apologize, Judge. I believe that that therefore, that became the authoritative starting point under the Supreme, on the House v. Bell. So I respectfully submit that the, if you take that line of reasoning from Herrera's, it does provide an authoritative starting point for an analysis of a freestanding claim of actual innocence. And I think that that's what the judges of this Court were thinking about when they granted the Certificate of Appeal ability to include a freestanding claim. So in that respect, I submit that, number one, the district court was implied an improper standard in evaluating the gatekeeping function part of it, you know, by using the clear and convincing evidence standard when, in fact, it's the more likely than not standard. And it's interesting. I did, I was the appellate lawyer in the Revers case, and we did have that in Revers too, where the district court employed an incorrect standard. It was remanded. In this case, I would respectfully submit to the Court that the judge's position is very clear. It would be futile. A remand is probably futile in this situation, and that this Court should rule on everything on the merits. And I would just note that with respect to the district court didn't rule on some aspects of the ineffective counsel claim on the theory that these, there was some specific allegations or contentions that were not exhausted at the State level. Well, I would note to the Court that the government has, the State has conceded that the ineffective claim here is exhausted, at least on page 26, footnote 9 of their brief. Now, let me just be clear on this. It's, it's, this ineffective claim is, is the, the, the various aspects of it strike that, Your Honors. The same trial lawyer, the trial lawyer who, one of the trial lawyers who tried the case was also the lawyer who did the direct appeal. There was a conflict there. And I believe under the Supreme Court's precedence that, that conflict excuses any procedural default with respect to failing to raise an issue on a direct appeal. In addition to that, in Trevino v. another Supreme Court decision, they're all in my claims to be raised, as the Federal courts prefer, on, on, on a collateral attack on a 440 motion, a New York provision, that because it's required generally to go on the 440 to raise the first claim of ineffective counsel, to, to, you have a statutory right to raise to a first a 440 motion, you can have ineffective counsel at that proceeding, and if you have ineffective counsel at that proceeding, it could constitute cause and prejudice for, to excuse a procedural default in a habeas corpus petition. But we had that here. We had Ms. Lavery represented Mr. Gross at the trial, and then she represented him on his first 440 motion. Okay? The district court incorrectly determined that, well, you know, I really can't look at that stuff because it wasn't raised at the proper time. There was a procedural default, and therefore, it's a regularly and consistently followed procedural default, and therefore, I don't address these specific instances of ineffective counsel on the merit. So respectfully, I think that that aspect of the district court's ruling is wrong. But you should have just so I'm understanding your argument, because I'm having a little bit of a difficult time. Yes. What does that mean for us? What did the district court get wrong that we, that it should have considered and that we should have? Well, because if you look at the totality of the errors that occurred here, you had by getting it wrong, the court's not addressing the merits of important contentions. What could it have addressed the merits of? Well, there were issues pertaining to counsel's failure to object to certain arguments made at the trial, summation objection by the by summation arguments by the district attorney, and the court specifies them, and I apologize for not having. That's fine. But that is a big part of this. No court has ever found that the no lower state court has ever determined that this was an overwhelming case. It's never been stated. So with respect to the ineffective claim itself, Your Honor, there's two pieces of it. The first part is, why didn't you object when you had all of this bolstering going on at the trial? This was serious bolstering, and the district attorney tied it right into the summation. It was used in the opening to say that the victim, you know, was had to tell somebody, was very disturbed about this. It was brought out repeatedly during the questioning of witnesses. The court ultimately did strike the testimony of two witnesses, but that was the day after these witnesses had testified and the jurors had slept on this. And then in summation. Why were there not prior consistent statements designed to rebut an argument of recent fabrication? Well, because there was no recent fabrication here. I thought the argument that was made at trial was that the reason the girls were falsely accusing your client was because of something he had done after he had made, after the victim had made these statements to an assistant or a teacher. Yeah, Your Honor, what it was is the argument was that the victim had emotional problems. She was from a broken family. She was very jealous of Mr. Gross's new family, his new children, and how they were The other girl, the next-door neighbor, J.S., was similarly from a broken home, divorced parents, and these kids became very, very close. So it was almost a year later before there was J.S., let's call her, came forward and after she was about something else that was undisclosed, it was never determined, but she was crying and then that's the first time it comes out about that Mr. Gross supposedly had committed these sexual acts against her. But prior to that, there was the first incident was supposedly in 2003 where there was allegedly attempted touching of his daughter. Then there was the incident in 2006 which involved the alleged rape of the friend. There's been, there was nothing reported by anyone up until that point. And then there was the incident, excuse me, in 2008 where supposedly he tried to touch the other girl or asked the other girl to touch him again, J.S. But the point of it was is that the defense wasn't even really making the argument that this wasn't, that there was no prompt outcry. The defense's argument was that you just can't believe them. So for the government to bring up, bring this stuff out when it before, before an attempt was made to impeach him on that basis, it would seem to be that that is the nature of bolstering. This was coming out on direct, not cross or not redirect, all of this bolstering stuff. And that was extremely, extremely prejudicial. There was no independent corroboration other than these two girls talking who had this symbiotic relationship. And there was nothing else other than their statements that establishes this case. And the circumstantial evidence was very powerful. And that's really the gravamen, I believe, of the ineffectiveness, was the failure to use what was available in this case, separate and apart from the failure to object to the improper bolstering. There was a plethora of physical evidence that was available, and I provide a list of it in my reply brief, that could have been used to demonstrate Google photo maps, demonstrate you could see clearly. Thank you, Mr. Langone. You're well over your time here, and you have reserved some time for rebuttal. Ms. Myeroff? Good morning, Your Honors. My name is Michelle Myeroff, and I represent the Respondent, Harold Graham. This Court granted a certificate of appealability on two cognizable claims. The first claim was whether trial counsel was ineffective for failing to object to prior consistent statements about the rape and the prosecutor's opening and closing remarks regarding those statements. And second, whether appellate counsel should have argued that trial counsel was ineffective on that basis. And neither of those claims has merit because trial counsel had no reason to object to this evidence and these remarks. As Mr. Langone stated, these convictions arose from three separate incidents involving two girls, Petitioner's daughter, S.W., and S.W.'s best friend, J.S., who lived next door to Petitioner. S.W. lived 30 miles away and visited Petitioner on some weekends and school breaks. And the three incidents involved here are, in 2003, Petitioner drove his 9-year-old daughter, S.W., to a field behind his house and exposed his penis to her and asked her to touch it. In 2006, in his daughter's presence, he raped the best friend, J.S., and at that time those girls were about 12 years old. And then in 2008, Petitioner drove J.S. to the same field where he had attempted to molest S.W. back in 2003 and J.S. kind of panicked and that Petitioner was going to sexually abuse her and then backed off. So about six weeks after that last incident, in 2008, the girls reported the crimes to police, and by that time the girls were 14 years old. I just wanted to get out that background that we're talking about three incidents and not all the girls were involved in all the incidents. So the prior consistent statements that Petitioner claims warranted objection consisted of J.S.'s testimony that she reported, that before she reported the rape to the police, she told her sister and her friend, different friend, about the rape. And testimony from J.S.'s guidance counselor about J.S.'s disclosure of the rape to her on the day that J.S. reported the rape to the police. And defense counsel had no reason to object to these statements, largely because they were admissible and served his interests. They may well have served his interests. Explain how they were admissible on direct. They were admissible on direct because K.C., the friends, the statement to the friend and the guidance counselor were part of the chain of disclosure leading to Petitioner's arrest. And this is a New York evidentiary rule that allows in child sex cases the completion of the narrative of the investigation. So it has to be nonspecific. You can't give a graphic recitation of what was said, but just something was said and something was done. And that is the nature of the testimony here. And then as to the testimony to the sister, that was made a year after the rape, but approximately a year before the disclosure. And that was admissible to rebut a claim of recent fabrication because Petitioner opened with, he opened with a statement that basically an incident had occurred a few weeks before the report to the police. And based on that, J.S. was angry and decided to get some revenge, to take out K.C. on Petitioner. And so that was the motive to fabricate. And so the much earlier disclosure to the sister was admissible under that. But in the opening, in the prosecution's opening, was there a reference to one or both of those prior statements? Yes. Okay. So both or one? The prosecutor just capsulized the trial proof. So the prosecutor just said, you know, here is a narrative of what happened. So why was the disclosure to the sister in 2007 something properly stated in the opening of the prosecution, before the defense opening? Well, this was actually part of ‑‑ it was clear to the prosecution even before opening that this was going to be the defense strategy. The prosecutor actually in a on-the-record colloquy confronted defense about it, and he didn't say that this was not going to be his strategy. And during voir dire, the defense attorney repeatedly asked the panel, do you think it's possible that a child could tell a story and then just get stuck in a lie? And actually his description of what he was describing to the jury was he was trying to find jurors who would believe that a child could try to tell a story. And one of those peers repeated that to a responsible adult, found herself having to adopt the lie. So the prosecutor had a good reason to believe this was going to be the defense. Well, but the recent fabrication turns on the suggestion that the motivation for J.S. in telling ‑‑ in accusing Mr. Gross was something that happened in like 2008, right? Yes. So I'm not sure why the statement from 2007 would be relevant for the opening. Well, the claim is that it is fabricated in 2008, so the disclosure in 2007 rebutts that claim. Am I understanding you? You said the voir dire talked about telling tall tales and getting stuck in a lie. It's not clear to me how that opens the door to an opening on a prior consistent statement from 2007. I see what you're saying. I mean, at the end of the day, I assume you're saying it's harmless because that was the defense. The defense was that there was this motivation to falsely implicate Mr. Gross based on something that happened in 2008, and the prior statements would have come in regardless. Yes. I mean, the thrust of the defense was that this rape victim is detached from reality, that she is just a troubled teen, emotionally disturbed, just looking for sympathy and attention and envious and just needing peer approval. Why did the district ‑‑ or the trial judge reverse course, having allowed this testimony to come in, why did he then decide to strike it or to change the ruling right before closing? I didn't understand that. What he ‑‑ what the Court explained was that he believed that at points the substance of that testimony strayed into a ‑‑ became too substantive, in the sense that the prosecutor was asking the friend and the sister questions about the rape victim's demeanor when she was making the disclosure. So it went a little bit beyond nonspecific information about just a sequence of events or a fact of a case, and what the Court said was we would be selling the jury short if we didn't think that they understood what was actually said in these disclosures. So I would say the Court acted in an abundance of caution and endeavor to protect petitioner's rights here. I see I have just seconds left. Does this Court want to hear about actual innocence? As to actual innocence, Petitioner asks this Court to recognize a new constitutional claim, which would be freestanding actual innocence, and since habeas relief is only available for violations of clearly established Supreme Court law, this Court should simply deny the claim as noncognizable. But in any event, there are two items of ‑‑ two items that Petitioner's opening brief identifies as proof of his actual innocence, and neither is ‑‑ neither is particularly compelling. The first is a 2005 survey of Petitioner's property, and that same survey was introduced at trial for the same purpose, which is that there was a stone boundary marker, you know, it's referred to as a wall, but it's quite low, two to three feet. It's not ‑‑ it's not keeping anybody out. It's just marking a property line. And that that was intact in 2003, and that, therefore, Petitioner could not have driven SW from the field to his house as she testified at trial. And at trial, there were some witnesses who testified that the wall was broken down at that point and vehicles could pass, and there were other witnesses who testified, no, the wall was intact, and at the end of the day, the jury saw the survey, heard this evidence, they either believed the witnesses who said the wall was broken down or they decided this is a collateral matter to the attempted sexual assault. The second piece of evidence is JS's incoming long distance telephone calls for June and July of 2006. At trial, Petitioner testified ‑‑ several witnesses testified that when SW was going to come to visit Petitioner, a number of people were involved in making these arrangements. Sometimes the arrange ‑‑ you know, parts of the arrangements might be made in person between JS and Petitioner since they were next door neighbors. There would be calls to ‑‑ there could be a call to SW directly or her mom or her stepdad. So there were lots of different people who could have been involved in arranging these visits, and at trial, Petitioner ‑‑ but the parties agreed that a phone call is generally involved in setting up these visits. So at trial, Petitioner introduced his own phone records, and they showed a phone call between him and SW on July 1st that lasted about three minutes. Petitioner testified that he remembered that call, that they ‑‑ he was at a graduation party, he called SW and said, do you want to come to the graduation party, and she was swimming, and that that call was not used to set up the visit where the rape occurred. The rape is charged with having occurred between July 1st and July 18th of 2006. So Petitioner did not obtain any other phone records until after trial. He got ‑‑ after trial, but before sentence, he received JS's incoming phone records, and those are not exculpatory. They are inculpatory because they actually show three more calls that could have been used to arrange the visit. There are three calls from SW to JS. The bottom line is, factually, it's going to fail anyway. Exactly. It's not ‑‑ it can't be proof of actual innocence because it is inculpatory. And if there are no further questions, I rely on my brief. Thanks, Ms. Merrill. Mr. Langone. Mr. Mono, thank you. First of all, with respect to the same survey, counsel's correct, and I apologize for that. It was a big record. There was a two or three foot wall, and she said it was not high enough to keep anybody out. The focus here was, was it high enough to keep a truck out? Could a truck drive over it? Because that was the allegation. The stories changed from initially that the testimony was he went, drove from the back of an open field owned by Mr. Cunningham to his home via the truck down to the house. Then it changes to no, no, he drove us both. Now, we've got different incidents where different people are involved. He drove us both to the scene via Master's Road, which is a mile away. Now, both of those girls have been in that area. JS lives there. He's the next girl. He's the next girl. They've spent many, many weekends there at that house. So they know the area. They know the roads. They know the difference between Master's Road a mile away and a path behind the house. Right. So how does the survey prove your client's innocence? Well, the survey, actually, Your Honor, when I saw the little Paul, the survey, or Paul Alwesky, I believe, had indicated that on one of the surveys, the little circles on the survey indicated where the wall was. And I saw that survey, and I thought that was very propitious in terms of, you know, picturing what it looked like back there. So that's why I had included it. And I didn't realize it was in this fairly large record. With respect to these three phone calls that counsel's talking about, we're talking about this 2006 incident, the first call on June 29th was nine seconds. Sounds to me like it was a call and a hangup. The second call was on July 3rd. It was 18 seconds. I have three daughters. I have never seen a young girl talk for less than a minute or two on the telephone. There was a third call July 9th, which was for one minute and 36 seconds. Okay? Other than that, there were no other calls during that month. Why does that prove your client's innocence? Well, I think the first two prove nothing. And I think the third one, it's kind of remote in terms of setting up an appointment for her to come and spend the night at the house. A minute and 36 seconds? No. You know, Your Honor, I get it. It's certainly not proof positive. But this case, in a purely, in a case like this, where the defense has got to be based entirely on circumstantial evidence, it's vital that every piece of information, it builds on itself. It's essential to demonstrate the, you know, falsities that you allege. I would like this Court to now carry on. What standard do we apply to review, to the review of the evidence that you say is pertinent here? In terms of the, your appellate review of the district court's decision? I would respectfully submit that it should be de novo. The district court is not making any findings of fact. It's not coming up with any of its own conclusions. It's predicating. If we're talking about the findings with respect to the errors that occur at the state court level, this Court should make a de novo determination. Your Honor, I have one just really quickly. With respect to this chain of disclosure that counsel speaks about in terms of nonspecific, in child sex abuse cases, the case law she's talking about, she's talking about case law that speaks to bills of particulars that are required under state law. Under New York state law, a defendant is entitled to a bill of particulars. They've relaxed that requirement in child sex abuse cases, because children can sometimes get confused about dates and times and that kind of stuff. But the point of it is, is that that nonspecific language in which she's talking about is limited only to bills of particulars in the state of New York, not evidentiary issues. Okay? It's just a pure discovery matter. Thank you. Thank you very much. Thank you both. We'll reserve decision in this case, and I will ask the clerk, please, to adjourn court. Thank you.